IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CHRISTOPHER DEGROOT and STEVEN SHOWALTER, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | 4:23-CV-3041 |
| vs. | MEMORANDUM AND ORDER |
| NEBRASKA BOOK COMPANY, INC., et al., | |
| Defendants. | |

In this certified class action, the plaintiffs—Christopher Degroot, Steven Showalter, and all others similarly situated—allege their former employer violated the federal Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq.*, and the Nebraska Wage Payment and Collection Act ("NWPCA"), Neb. Rev. Stat. § 48-1228 *et seq.*, when it terminated them without notice and without paying accrued but unused paid time off. *See* filing 139 at 2.

The defendants are the plaintiffs' former employer, Nebraska Book Company, Inc., and Nebraska Book's parent company, Nebraska Book Holdings, Inc. (collectively, "Nebraska Book"). The plaintiffs also assert that two other companies, AB Lending SPV I d/b/a Mountain Ridge Capital ("Mountain Ridge") and Concise Capital Management ("Concise"), are liable based on their financial relationships with Nebraska Book.

This matter is before the Court on all the parties' motions for summary judgment. Filing 156 (Nebraska Book); filing 157 (Mountain Ridge); filing 167 (Concise); filing 173 (plaintiffs). The plaintiffs have also moved to exclude two

experts. Filing 148; filing 151. Mountain Ridge moved to strike the plaintiffs' jury demand as to their claims under the WARN Act (filing 180); for reasons explained below, that motion is dismissed as moot. Mountain Ridge also moved to join in certain arguments briefed by Concise and Nebraska Book (filing 179); that motion was unopposed and will be granted.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are functions for a factfinder, and are not appropriate for summary judgment. *See id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be

insufficient; there must be evidence on which the factfinder could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. BACKGROUND

Unless otherwise noted, the following narrative consists of the undisputed facts for purpose of the pending summary judgment motions:

Nebraska Book was a wholesale textbook distributor for college bookstores. It also provided retail technology and consulting services, and had an independent software business. Its peak months were August and January, the traditional start of college semesters. On March 1, 2023, Nebraska Book shut down its operations and the company was liquidated. Filing 195 at 1.

Concise is a company that usually invests in short-term, high yield bonds. *Id.* In 2012, it purchased bonds in Nebraska Book's funds, when Nebraska Book was a well-positioned, profitable company. Filing 175-10 at 23. Over the next few years, however, Nebraska Book's performance deteriorated, and Concise extended millions of dollars in loans to keep the company afloat. *See id.*; filing 195 at 4. In 2018, after converting some of Nebraska Book's indebtedness into equity, Concise became a minority owner. Concise appointed Ken Grossman, a long-term financial advisor to Concise, to represent it on Nebraska Book's board of directors. Filing 195 at 3.

Concise acquired 100 percent of the equity in Nebraska Book by 2021, becoming the company's "accidental owner." Filing 197 at 5. After 2018, Concise did not take "a penny" from Nebraska Book to pay its investors. Filing 175-10 at 14. As owner, Concise had the power to appoint all of the directors

3

on Nebraska Book's board. During the relevant time, there were three board members, all appointed by Concise. They were Grossman; Gary Shapiro, Nebraska Book's CEO; and Thomas Krasner, a principal, cofounder, and minority owner of Concise. *See* filing 175-10 at 199. Nebraska Book maintained its own operational and personnel policies, including hiring, firing, payroll, and other day-to-day decisions.

Nebraska Book continued to struggle, and needed additional investment. It found a lender willing to issue an "asset-based loan"—a revolving line of credit with a security interest in the company's accounts receivable and inventory. *See* filing 175-25 at 8; filing 164 at 4. Concise agreed to subordinate its debt to that lender. Filing 175-10 at 31.

But Nebraska Book struggled to repay the line of credit. In May 2022, the lender wrote to the Nebraska Book board, concerned that the board's "sole focus appears to be selling" its independent software business, "with the hope that a sale may preserve Concise's equity and subordinated debt positions while completely ignoring [Nebraska Book's] urgent liquidity issues and other contingency planning." Filing 175-15 at 2. Ultimately, Nebraska Book paid off that lender by selling the software business. Filing 175-10 at 63.

Concise considered liquidating Nebraska Book in May 2022. Filing 175-10 at 37. Instead, the board endeavored to find a new asset-based lender to keep the company running. Concise extended a higher-interest, $7 million "bridge loan" in the meantime. Krasner advised the board that Concise would not invest additional funds into Nebraska Book. Filing 197 at 8.

Nebraska Book also looked into a business partnership with its largest customer, Follett Higher Education Group, beginning around June 2022. Filing 197 at 8-9. Shapiro was a former Follett executive who maintained positive relationships with Follett's leadership. Filing 175-2 at 31-32. The

companies discussed some type of relationship that would result in greater operating capital for Nebraska Book, such as Nebraska Book assuming operational management of Follett's distribution warehouses for its virtual bookstores. Filing 160 at 4-5. Nebraska Book would need some form of capital investment to develop the necessary infrastructure for that deal, and Follett was willing to extend a loan. These conversations were ongoing until Nebraska Book was liquidated.

In September 2022, Krasner and Grossman, without Shapiro, finalized a new asset-based loan agreement with Mountain Ridge, a company that specializes in those types of loans. *See* filing 175-10 at 79. Concise again agreed to subordinate its loan to let the deal with Mountain Ridge proceed, but arranged the deal so that the bridge loan could be repaid first (though Concise was never actually repaid for that loan). Filing 175-10 at 77-78. At that point, it appeared that Follett would not need to provide any loan to Nebraska Book for their partnership plans to move forward.

Under the terms of the loan agreement, Mountain Ridge had a security interest in all of Nebraska Book's accounts receivable and inventory. That meant Mountain Ridge collected Nebraska Book's cash receipts in a collateral deposit account, and Nebraska Book would have to request funds for payroll, paying vendors, and other expenses. *See* filing 175-2. By early 2023, Mountain Ridge required Nebraska Book to submit weekly funding requests for Mountain Ridge to review and approve.

Even with Mountain Ridge's revolving line of credit, Nebraska Book's liquidity problems persisted. The fall 2022 semester did not bring in as much business as expected. *See* filing 175-10 at 128. The plaintiffs allege that by October 2022, Krasner and Grossman were more actively managing Nebraska Book, including payroll decisions, inventory levels, and technical

infrastructure. Filing 184 at 6. In December 2022, Krasner and Grossman again discussed liquidating the company, and the plaintiffs allege Shapiro was not a part of these conversations. *See* filing 175-23 at 1.

In or around December 2022, Mountain Ridge expressed it would consider funding a budget to get Nebraska Book through August, its next selling season. Filing 163-20 at 25. There is contradictory evidence about why Mountain Ridge did not end up extending that additional funding. *Compare* filing 163-20 at 26 ("We [Mountain Ridge] were in the middle of talking to them about honing a budget. And then we were informed they were going to liquidate and shut the door."), *with* filing 175-2 at 35 ("But as it turns out, we [Nebraska Book] asked for things that they [Mountain Ridge] felt they couldn't be flexible on . . . "). On February 22, Mountain Ridge agreed to provide an over-advance of $450,000 to ensure Nebraska Book "could remain operating for at least another few weeks," on the condition that it be repaid by February 28.

In January 2023, Krasner suggested cutting Shapiro's salary, effectively terminating his employment. *See* filing 175-22 at 1. Because Shapiro had given "completely inaccurate" sales forecasts, Krasner saw his management as "nonfunctioning." Filing 175-10 at 168. Krasner made other cost-saving suggestions involving staff hours and wages. According to Krasner, Concise "did not have confidence" in Nebraska Book's management. Filing 170-3 at 28.

The plaintiffs allege that Krasner and Grossman, at that point, discussed liquidating Nebraska Book. And the record supports an inference that Nebraska Book's management, including Shapiro, was unaware of these discussions. At an industry conference in early February, Shapiro and another employee expressed they were optimistic about the company's future. Filing 195 at 10-11. As late as February 20, 2023, management of Nebraska Book

6

drafted an hour-reduction plan to the workforce as a cost-saving measure. Filing 195 at 12.

But Nebraska Book needed money, and began discussing a capital investment or loan from Follett again, sometime in mid-February. Follett agreed to extend a loan—but wanted it guaranteed by either Concise or Mountain Ridge. Nebraska Book did not expect this condition, and neither Concise nor Mountain Ridge were willing to guarantee the struggling company's debt. The deal with Follett collapsed around February 20 or 21, 2023. *See* filing 175-2 at 35.

Without the loan from Follett, additional funding from Mountain Ridge, or additional investment from Concise, Nebraska Book could not make payroll or its other expenses. According to the plaintiffs, around February 25 or 26, Krasner made the ultimate decision to liquidate the company, rather than file bankruptcy, and Shapiro and Grossman "acquiesced" to the decision. Filing 184 at 4. Concise and Nebraska Book contest the plaintiffs' evidence, and assert that Krasner, Shapiro, and Grossman decided together to liquidate the company, evidenced by a resolution signed by all of the board members. *See* filing 170-13; filing 202 at 16.

Once the company decided to liquidate, Nebraska Book management prepared a budget for Mountain Ridge to fund a wind-down plan. Nebraska Book had defaulted on the over-advance from Mountain Ridge. To preserve its collateral, Mountain Ridge agreed to fund the wind-down budget. The budget included employees' unpaid, accrued paid time off, but, according to the plaintiffs and the other defendants, Mountain Ridge declined to fund that expense. Filing 175-2 at 46; filing 175-10 at 193.

Mountain Ridge asserts it provided the requested funds, and did not exert control over how those funds were spent. The original wind-down budget

would have covered the unpaid accrued time off, but the budget did not account for post-liquidation complications, including this and other lawsuits, a tax lien, and a tax garnishment. *See* filing 196 at 23; filing 175-28 at 7.

Nebraska Book issued a WARN Act notice to its 242 employees on February 27, 2023, informing them that the company planned "to discontinue all of its operations" beginning March 1, 2023. Filing 129-13 at 2. The notice provided:

> As background for why NBC did not provide prior notice, please know that NBC is in a dire financial position. Management has spent the last several months feverishly looking for the additional capital investment NBC needs to maintain operations until next season. NBC had several potential options that management thought were viable and would have allowed NBC to avoid this situation, but the last one backed out a few days ago. Management believed that if it had sent this notice earlier, our vendors would have stopped doing business with NBC and potential sources of capital would have ceased discussions with NBC.

*Id.* Most employees were terminated immediately, but some continued in phases through April 2023. Management waited to lay off employees until March 1 to allow an extra month of health insurance and other benefits. At least 126 employees were terminated within 60 days of receiving the notice.

No employees were paid their accrued paid time off. Mountain Ridge was fully repaid. Concise is unlikely to recover most of its $31 million in secured loans.

8

## III. DISCUSSION

### 1. WARN ACT LIABILITY—STATUTORY AFFIRMATIVE DEFENSES

Under the WARN Act, employers who order a plant closing or mass layoff must provide sixty days' written notice to affected employees. 29 U.S.C. § 2102(a)(1). Nebraska Book closed its "plant"[1] effective March 1, 2023, *see* filing 129-13 at 2, so a WARN notice was due December 31, 2022. But various statutory exceptions to the sixty-day requirement operate as affirmative defenses. § 2102(b); *United Steel Workers of Am. Loc. 2660 v. U.S. Steel Corp.*, 683 F.3d 882, 885 (8th Cir. 2012) (citing *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1060 (8th Cir.1996)); *Burnsides v. MJ Optical, Inc.*, 128 F.3d 700, 703 (8th Cir. 1997).

In this case, the defendants[2] are asserting two exceptions. First, under the "faltering company" exception, an employer need not give sixty days' notice if it was actively trying to avoid a plant closing, and giving a WARN notice would have upset those tactics. *See* § 2102(b)(1). Second, the "unforeseen business circumstances" defense applies where the plant closure is "caused by business circumstances that were not reasonably foreseeable [when the sixty-day] notice would have been required." § 2101(b)(2)(A). In either situation, the employer "shall give as much notice as is practicable and . . . a brief statement

---

[1] "Plant closing" is defined as "the permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees[.]" § 2101(a)(2). The parties appear to agree that Nebraska Book's actions constitute a "plant closing" for purposes of the WARN Act.

[2] Concise and Nebraska Book's briefing on these issues is identical. *Compare* filing 168 at 24-30, *with* filing 161 at 3-10. Mountain Ridge filed an unopposed motion to join in these arguments. Filing 179. So, the defendants are referred to collectively for these issues.

of the basis for reducing the notification period." § 2102(b)(3); *see also Sides v. Macon Cnty. Greyhound Park, Inc.*, 725 F.3d 1276, 1285-86 (11th Cir. 2013).

At the outset, the plaintiffs argue the "brief statement" in Nebraska Book's notice was insufficient to trigger the affirmative defenses. Filing 174 at 22. Nebraska Book's notice informed employees that Nebraska Book was "in a dire financial position," that it "spent the last several months feverishly looking for the additional capital investment" it needed, and that one of "several potential options that management thought [was] viable . . . backed out a few days ago." Filing 129-13 at 2.

A notice is adequate if it is specific and "based on the best information available to the employer at the time the notice is served." 20 C.F.R. § 639.7(a)(4); *see also In re AE Liquidation, Inc.*, 866 F.3d 515, 524 (3d Cir. 2017). Courts have found this requires some mention of "concrete facts" that justify the shortened notice. *In re United Furniture Indus., Inc.*, 667 B.R. 441, 493 (N.D. Miss. 2024) (citing *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389-90 (9th Cir. 1994)); *see also In re Yellow Corp.*, No. 23-br-11069, 2024 WL 5181660, at *16 (Bankr. D. Del. Dec. 19, 2024) (collecting cases). The purpose is to provide affected employees with the reason for the reduced notification period, and to prevent employers from "asserting litigation-convenient but factually post hoc justifications for their actions." *Sides*, 725 F.3d at 1285-86.

Nebraska Book's notice indicated the company attempted to secure necessary "capital investment," but its last option backed out at the last minute. Due to Nebraska Book's "dire financial situation," it was unable to continue operating. This provided employees with the concrete facts necessary to "'assist' the employees in 'understand[ing] the employer's situation and its reasons for shortening the notice period.'" *AE Liquidation*, 866 F.3d at 525 (quoting *Alarcon*, 27 F.3d at 389). Based on the foregoing, the Court finds that

there is no material dispute that Nebraska Book's WARN notice adequately informed the employees of the reason for the closure, and the reason for the reduced notification period. *Compare* filing 129-13 at 2, *with Alarcon,* 27 F.3d at 390 (adequate notice where letter stated performance of company was "disappointing, that the working capital did not make it a viable entity, and that the company had unsuccessfully pursued several options for purchase"), *and AE Liquidation,* 866 F.3d at 525 (adequate notice where letter described "buyer's unexpected failure to obtain funding," the "dire financial conditions," and the "unavailability of additional funds").

### (a) Unforeseeable Business Circumstances

While the defendants appear to primarily rely on the faltering company exception, *see infra*, they also raise the "unforeseeable business circumstances" defense, § 2102(b)(2)(A). But based on the undisputed facts, this exception to the sixty day notice requirement does not apply.

This affirmative defense involves a "highly factual inquiry to be assessed on a case-by-case basis." *Loehrer,* 98 F.3d at 1060. The inquiry is objective— whether a similarly situated employer would do the same thing in predicting the demands of its particular market. *Id.* at 1061. No event is *per se* unforeseeable. "So long as it may still fairly be said that the eventual plant closing . . . is caused by a sudden, dramatic, and unexpected event outside the employer's control, the exception applies." *Id.*

As early as December 2022, and arguably as early as May 2022, it was clear Nebraska Book was underperforming its forecasted sales and was deeply in debt. The board (or at least Krasner and Grossman) considered liquidating at that point. While some of Nebraska Book's management remained optimistic that the company would recover, there's nothing in the record to

11

support an inference that Nebraska Book's financial distress or the possibility of liquidation was "sudden, dramatic, and unexpected."

The defendants argue that the revenue shortfalls in the "final months of 2022 and into early 2023 . . . were certainly not probable or expected as of December 29, 2023." Filing 168 at 30; filing 161 at 9-10. They argue that something was unforeseeable as it was happening; no reasonable factfinder could draw this conclusion. The plaintiffs are entitled to summary judgment on the defendants' § 2102(b)(2)(A) defense.

### (b) Faltering Company Exception

The defendants also raise the faltering company exception, § 2102(b)(1), an affirmative defense that is narrowly construed, 20 C.F.R. § 639.9(a). For this exception to the notice period to apply, there are four requirements:

1.    An employer proves it was "actively seeking capital or business" at the time that 60-day notice would have been required, by identifying "specific actions taken to obtain capital or business," including "seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially reasonable method[;]"

2.    There was a realistic opportunity to obtain the financing or business sought;

12

3.      The financing or business sought would have been sufficient to avoid or postpone the shutdown; and

4.      The employer reasonably believed that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given.

20 C.F.R. § 639.9(a); *see also* 29 U.S.C. § 2102(b)(1).

The plaintiffs argue that Nebraska Book was not actively seeking capital at the time the 60-day notice would have been required, and it never had a realistic opportunity to obtain the financing sought. *See* filing 198 at 4-5. The plaintiffs argue that attempts to obtain a loan from Follett did not occur until February 2023, well after the 60-day deadline, and that any sort of loan was not realistic because Follett wanted Nebraska Book's other lenders to guarantee the loan, which the plaintiffs argue was a non-starter. The plaintiffs do not appear to dispute the other two elements of the exception. *See* filing 197 at 19; filing 174 at 23; filing 198 at 4-5.

An employer who is "waiting" for another entity to offer additional financing cannot be characterized as "actively seeking" a capital investment. *See In re APA Trans. Corp. Consol. Litig.*, 541 F.3d 233, 250 (3d Cir. 2008). But the regulations don't require a "faltering" company to be actively seeking a *loan. See* § 639.9(a)(1). The regulations contemplate a wide variety of business opportunities that could save a faltering company, including the proposed partnership between Follett and Nebraska Book. *See* § 639.9(a)(1).

These facts are undisputed: Nebraska Book began negotiating with Follett in June 2022. In September 2022, Mountain Ridge became an asset-based lender, and it appeared that the deal with Follett wouldn't require a

13

capital investment or loan from Follett. *See* filing 175-2 at 34. But in January 2023, Nebraska Book was short on cash, and for the business deal with Follett to work, Follett would need to extend a loan. *See id.* Follett, unexpectedly but understandably, conditioned the loan on a guarantee from Nebraska Book's lenders. Equally understandably, Concise Capital and Mountain Ridge declined to make such a guarantee. And at that point, Nebraska Book liquidated.

The plaintiffs assert that the discussion of a *loan* from Follett ceased in September—but it's undisputed that the overall partnership, from which Nebraska Book reasonably expected to obtain at least enough business and capital to make it to the next busy season, was still in discussion. The plaintiffs have presented no evidence by which a factfinder could infer that Nebraska Book was not actively seeking a realistic opportunity to stay afloat sixty days before its plant closure. Nebraska Book has specifically identified a potential business prospect, and it was a realistic opportunity, based on Nebraska Book's CEO's relationship with Follett and Follett's parallel business interests. *See* filing 195 at 6.[3] It would appear that the undisputed facts show the faltering company exception excuses Nebraska Book from the sixty day requirement of § 2102(a).

---

[3] The plaintiffs' response to Nebraska Book's statement of undisputed facts is somewhat unclear; it appears the numbering is misaligned. Regardless, to the extent the plaintiffs appear to dispute Follett's "incentive" to "consummate some sort of deal with Nebraska Book," the plaintiffs failed to "include pinpoint references" to any evidence that refutes Nebraska Book's statement of fact. *See* filing 195 at 6 (citing the plaintiffs' inoperative complaint); NECivR 56.1(b)(1)(A).

## 2. APPLICABILITY OF THE AFFIRMATIVE DEFENSE

But the plaintiffs also argue that Concise Capital and Mountain Ridge, as "indisputably solvent entities with access to capital, treated as a single employer," cannot raise the faltering company exception. Filing 174 at 23. And that makes sense—if Concise and/or Mountain Ridge were the plaintiffs' employer, and *those* companies weren't "faltering," then the affirmative defense couldn't apply. *See* § 639.9(a)(4) ("The actions of an employer relying on the 'faltering company' exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the facility . . . to be closed."); *Chaney v. Vt. Bread Co.,* No. 2:21-cv-120, 2023 WL 5589113, at *12 (D. Vt. Aug. 24, 2023).

If a company has "substantial assets or cash which it simply chooses not to use to save" its faltering subsidiary, the exception does not apply. *See* Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16042, 16061-62 (Apr. 20, 1989) (codified at § 639.9). Even if it may be sound business judgment to close a branch, a company must give the requisite 60 days' notice, unless it *must* close one branch to save others. *See id.* That is, a company can avail itself of the faltering company exception to save the company, but not to save the company money.

Both Concise and Mountain Ridge assert they are not "employers" as defined by the WARN Act, so their solvency isn't relevant to Nebraska Book's insolvency. The Court set forth the applicable law in its previous memorandum and order: the relevant Department of Labor regulations, *see* 20 C.F.R. § 639.3(a)(2), and the Eighth Circuit's lender-liability analysis in *Adams v. Erwin Weller Co.*, 87 F.3d 269, 271 (8th Cir. 1996). Filing 93 at 7.

*Loper Bright*

First, Concise asks the Court, in the wake of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), to ignore the Department of Labor's interpretation (and subsequent court interpretations) of the WARN Act, and to hold that the WARN Act does not permit "the amalgamation of multiple companies." Filing 168 at 9-10. The WARN Act requires "employers" to provide sixty-day notice of a plant closing. § 2102(a). The statute provides:

> the term "employer" means any business enterprise that employs—
>> (A) 100 or more employees, excluding part-time employees; or
>> (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)[.]

§ 2101(a)(1). The corresponding regulations provide an identical definition. *Compare id.*, *with* 20 C.F.R. § 639.3(a)(1). The regulations also consider if "independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent." § 639.3(a)(2).

To enforce federal labor laws, federal common law has long recognized relaxed alter-ego and veil-piercing theories of corporate liability. *E.g., Arnold v. LME, Inc.*, 537 F. Supp. 3d 1050, 1056 (D. Minn. 2021) (citing *Bhd. Of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26 (1st Cir. 2000)); *Nat'l Lab. Rels. Bd. v. Bolivar-Tees, Inc.*, 551 F.3d 722, 728 (8th Cir. 2008) (citing *Minn. Labs. Health and Welfare Fund v. Scanlan*, 360 F.3d 925,

16

928 (8th Cir. 2004), *Nat'l Lab. Rels. Bd. v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993)); *Esmark, Inc. v. Nat'l Lab. Rels. Bd.*, 887 F.2d 739, 757 (7th Cir. 1989). In the absence of express statutory language indicating otherwise, Congress is presumed to have legislated with these common-law principles in mind. *See, e.g., United States v. Bestfoods*, 524 U.S. 51, 62-63 (1998); *Burks v. Lasker*, 441 U.S. 471, 478 (1979).

In *Adams*, the Eighth Circuit relied not on Department of Labor regulations, but the text of the WARN Act and common-law underpinnings of corporate liability. 87 F.3d at 271. Apart from the Ninth Circuit decision, the Eighth Circuit relied on cases involving state veil-piercing common law, not the WARN Act. The court cited its own precedent discussing alter-ego liability in a diversity case, as applied to a lender's relationship with a debtor. *See id.* (citing *Chicago Mill & Lumber Co. v. Boatmen's Bank*, 234 F. 41, 46 (8th Cir. 1916)). And, the court cited a Fifth Circuit opinion, similarly discussing, under state common law, that a lender may incur its debtor's liability if the debtor is an "instrumentality" of the lender. *See id.* (citing *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1105 (5th Cir. 1973)).

The Ninth Circuit case cited by the *Adams* court also relied on the "plain language" of the statute in finding "the crucial question is not the status of the [lender]'s legal relationship to the business, but, instead, if at the time of the plant closing or mass layoff the [lender] is responsible for operating the business as a going concern." *Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Loc. 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995). That court determined the Department of Labor's commentary *supported* its interpretation, *see id.*, but it neither relied on, nor deferred to, the Department's conclusions or definitions.

17

Concise insists the WARN Act does not contemplate holding *multiple* employers liable for violations of those laws. *See* filing 168 at 11, 31. But the point of corporate veil-piercing is determining whether a parent company (or lender) and its subsidiary (or debtor) are so interdependent they are effectively a single entity. The Department of Labor's five-factor test, and the Eighth Circuit's *Adams* analysis, are dependent not on some broad-sweeping extra-statutory authority asserted by the executive branch, but on common-law understandings of corporate liability. *See Adams,* 87 F.3d at 271; *Coppola v. Bear Stearns & Co.,* 499 F.3d 144, 148 (2d Cir. 2007); *Loc. 572,* 66 F.3d at 244; *Cleary v. Am. Capital, Ltd.,* 59 F. Supp. 3d 249, 253 (D. Mass. 2014). The contested regulation, 20 C.F.R. § 639.3(a)(2), is clearly within the scope of the WARN Act and the Department of Labor's authority.

Taken to its logical conclusion, Concise's argument implies that a company could evade WARN Act liability or other federal labor laws by acting through a shell company to sign employees' paychecks and otherwise act as an employer-in-name-only. That's precisely the sort of corporate gamesmanship that led to veil-piercing theories of liability in the first place. Concise's reliance on *Loper Bright* is misplaced, and the Court will proceed to evaluate the defendants' potential liability under the WARN Act.

### (a) Mountain Ridge

The parties appear to agree that the *Adams* analysis applies to Mountain Ridge's relationship with Nebraska Book. As the Eighth Circuit articulated:

> WARN's obligations can apply to a secured lender. [But] the mere fact the loan documents give some control over the borrower to protect the lender's security interest does not automatically make

18

the lender a WARN employer. A lender can legitimately restrict its borrower's financial and business activities, monitor the borrower's business doings, and participate in the borrower's management, to protect the lender's investment and the collateral securing its loan. Understandably, lenders who loan large sums of money must be afforded substantial leeway in pursuing their bargained-for rights with a borrower in financial distress. Only when a lender becomes so entangled with its borrower that it has assumed responsibility for the overall management of the borrower's business will the degree of control necessary to support employer responsibility under WARN be achieved. Thus . . . a lender only becomes a WARN employer when the lender operates the borrower's assets as a business enterprise in the normal commercial sense.

*Adams*, 87 F.3d at 271-72.

In *Adams*, the lender restricted its debtor's financial affairs, including an "extensive security interest" in the debtor's assets, a "lockbox arrangement" for cash receivables, a revolving line of working capital for daily operations, and the ability to monitor assets, inventory, and expenditures. *Id.* at 272. The lender also made suggestions to improve the debtor's profitability, which the debtor enacted. *Id.* The Eighth Circuit determined that because the lender had no right to manage the debtor's business activities, nor the right to tell the debtor how to spend its working capital, the lender's use of "legitimate financial controls" did not make it an employer under the WARN Act. Although the creditor "undoubtedly" had the "capacity to exert influence" over its debtor's decisions, "this power is inherent in any debtor-creditor relationship

19

and its exercise does not translate into decision-making control for the purposes of WARN's employer rule." *Id.*

In *Coppola*, the Second Circuit applied the *Adams* rule. 499 F.3d at 150. It found a lender was not an employer under the WARN Act when it allegedly fired the debtor's officers, chose a replacement, and regulated other loans the debtor could take. Rather, the lender "exerted the control necessary" to possibly salvage the deteriorating debtor. *Id.* at 151. Even though the lender "purchased nearly all of the debtor's output and the debtor's operations were financially dependent on the lender's infusions of capital," the lender's conduct "was prompted solely by a short-term interest" to recoup "some of the debt it had extended." *Id.* at 151-52. In the Second Circuit's view, only when a lender's control of a debtor's business is not reasonably related to a "specific debt-protection scenario" can a lender incur WARN Act liability. *See id.* at 150.

Here, the plaintiffs argue that Mountain Ridge managed Nebraska Book's activities and told the company how to spend its working capital. All of Nebraska Book's cash was kept in a collateral account controlled by Mountain Ridge, and Mountain Ridge had to "review and approve" expense requests for daily operations. The plaintiffs point specifically to Mountain Ridge's alleged refusal to provide funds for paying employees' accrued, unused paid time off.

But in *Adams*, "a lender's refusal to loan additional working capital to an insolvent and delinquent borrower . . . [did] not make the lender an employer for WARN purposes." 87 F.3d at 273; *see also Coppola,* 499 F.3d at 147. That the lender extended a revolving line of working capital for daily operations also did not affect the analysis. *Adams,* 87 F.3d at 272.

In this case, Mountain Ridge merely exercised the control it had by virtue of its security interest in Nebraska Book's accounts receivable. Mountain Ridge's alleged "control" over Nebraska Book is better described as leverage.

20

Despite the plaintiffs' contentions, nothing in the record supports an inference that Mountain Ridge had the authority, or ability, to manage or operate the company. Rather, Mountain Ridge "controlled" Nebraska Book's cash funds only "as a means to protect its security for repayment." *See Coppola,* 499 F.3d at 148-49.

The plaintiffs appear to assert that Mountain Ridge was withholding Nebraska Book's cash. But the money in those accounts was Mountain Ridge's, subject to the asset-based loan agreement and revolving line of credit. All the money the insolvent Nebraska Book received to run its company was from the line of credit extended by Mountain Ridge.[4]

The plaintiffs also argue that Mountain Ridge is liable under a "transaction-specific theory," citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d. Cir. 2001). Filing 198 at 17. According to the plaintiffs, because Mountain Ridge "directed" Nebraska Book to liquidate rather than declare bankruptcy, "vetted and approved" the WARN notice, and "was the deciding voice against paying" the employees' accrued time off, Mountain Ridge exercised "de facto" control over Nebraska Book.

But *Pearson* applied the factors in § 639.3(a)(2), and expressly rejected the analysis in *Adams*. This Court is not at liberty to do the same. Under Eighth Circuit precedent, there's no basis to apply the § 639.3(a)(2) factors because Mountain Ridge was not an owner of Nebraska Book.

---

[4] There's some indication that Mountain Ridge was overcollaterized (*i.e.*, the value of the collateral exceeded the debt). *See* filing 170-3 at 28. But Mountain Ridge exercised control over Nebraska Book's cash only to the extent it controlled the collateral—specifically, the accounts receivable.

In any event, the plaintiffs' allegations indicate that Mountain Ridge was involved only in managing its debtor's financial affairs, which is not sufficient to take on its debtor's liabilities. *See Loc. 572,* 66 F.3d at 245 (no liability where creditor "[u]nquestionably . . . maintained an on-going involvement in [debtor's] financial problems," including "approving or disapproving" funds needed to discharge debtor's financial obligations). That management is "consistent with the type of control a secured creditor legitimately may exercise over a defaulting debtor to protect collateral securing a loan," and does not make a lender an employer under the WARN Act. *Id.*

Because no reasonable factfinder could find that Mountain Ridge exercised more control over Nebraska Book than necessary to effectuate its security interest, Mountain Ridge's motion for summary judgment as to liability under the WARN Act is granted.

### (b) Concise

As already discussed, the question before the Court is whether the relationship between Concise and Nebraska Book was such that Concise can be considered liable for Nebraska Book's WARN Act violation. While the nature of their relationship began as creditor-debtor, it's undisputed that by June 2020, Nebraska Book was wholly owned by Concise. It appears, then, that the five factors in § 639.3(a)(2) apply: (i) common ownership, (ii) common directors or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.[5]

---

[5] While Concise's ownership of the company was "accidental," based on its status as a lender, that doesn't change the fact that Concise was Nebraska Book's owner. *See Pearson,* 247 F.3d

The Department of Labor factors aren't exclusive, and no factor is dispositive. *E.g., Gautier v. Tams Mgmt., Inc.*, 163 F.4th 786, 792 (4th Cir. 2026). The ultimate inquiry is the degree of control the owner exercised over the company, and whether the two corporate entities operated at arm's length. *E.g., Geelan v. Mark Travel, Inc.*, No. 03-cv-6322, 2006 WL 3610804, at \*3 (D. Minn. Dec. 11, 2006); *cf. Adams*, 87 F.3d at 272. And, viewing the record as a whole, the Court finds there is a material issue of fact as to whether Concise exercised the requisite control over Nebraska Book so as to incur WARN Act liability.

Concise and Nebraska Book had no shared personnel policies, employees, or machines. *Cf. Gautier*, 163 F.4th at 793; *Geelan*, 2006 WL 3610804, at \*4. But there's no question that Concise and Nebraska Book shared ownership and directors, as Concise wholly owned Nebraska Book and Krasner was an officer of both companies. *See Geelan*, 2006 WL 3610804, at \*3. And, according to the plaintiffs, Concise, through Krasner, exerted significant control over Nebraska Book, particularly in determining whether to liquidate and when to terminate the plaintiffs' employment. *See, e.g.,* filing 175-21; filing 175-22; filing 175-23; filing 175-26; filing 175-27.

It's true that "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately," and courts generally presume the directors are wearing their "subsidiary hats" when acting for the subsidiary. *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 142 (S.D.N.Y. 2004) (quoting *Bestfoods*, 524 U.S. at

---

at 477-78; *Coppola*, 499 F.3d at 150; *cf. Adams*, 87 F.3d at 271 (no indication that the lender owned any part of the company that violated the WARN Act). The Department of Labor test, and not the *Adams* analysis, therefore applies.

69). But that presumption can be rebutted when conduct deviates from norms of corporate behavior. *See Bestfoods*, 524 U.S. at 70 n.13 (presumption is strongest when conduct "is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent"). In the instant case, whether Krasner was acting for Nebraska Book or for Concise is an impossible question to answer at this juncture—at least as a matter of law.

Certainly Nebraska Book's and Concise's interests were in harmony for most of the businesses' relationship: Concise couldn't make its money back unless Nebraska Book was financially successful. But when Nebraska Book couldn't secure funding to continue on, Concise and Nebraska Book's interests were no longer aligned. Concise had three options: extend additional money to Nebraska Book, cut its losses and liquidate, or do nothing. Liquidation was the most favorable option for Concise to ensure the maximum recovery of its debt.

Companies act through their agents. For an owner-company to disregard the "separate legal personality" of its subsidiary by directing the subsidiary to act a certain way, *see Pearson*, 247 F.3d at 496, an agent would necessarily do the directing. If Concise directed Nebraska Book to liquidate, it did so through Krasner—so, it's up to the factfinder to consider the witnesses' credibility and the parties' evidence to decide what "hat" Krasner was wearing: was he acting in Nebraska Book's interests, or those of Concise?

The plaintiffs allege that Krasner made the decision to liquidate the company. *See* filing 175-5 at 4. While this fact is disputed, *see* filing 202 at 16, it's reasonable to infer that Krasner was wearing his Concise "hat," not his Nebraska Book "hat," when it came to laying off the plaintiffs. *See* filing 175-2 at 105-106. Krasner testified that Concise "did not have confidence" in

24

Nebraska Book's management; it's reasonable to infer that Concise disregarded Nebraska Book's independent corporate identity to finally end its decade-long failed investment.

There's little reason to doubt Concise *could have* given more money to Nebraska Book, at least to keep the company going an additional sixty days.[6] Krasner insists Concise was not obligated to do so. *See* filing 175-10 at 189.[7] But Concise was more than a secured lender of Nebraska Book; it was its owner, and the plaintiffs have presented evidence by which a reasonable factfinder could find that Concise exercised full control over Nebraska Book by the time Nebraska Book shuttered its doors and terminated its employees.

Based on the record before the Court, a reasonable factfinder could believe either party's characterization of Concise's role in Nebraska Book's day-to-day management, particularly in the months leading up to liquidation. Summary judgment, for either party, is not appropriate for this issue, which may well be the ultimate issue in this case. If Concise exercised the level of

---

[6] Krasner testified that "[n]o reasonable investor" would have supported giving additional funds to Nebraska Book, filing 175-10 at 142, and Shapiro testified that "Concise's charter requires them to limit their investment to a certain percentage of their total business," and Nebraska Book had exceeded that limit, filing 175-2 at 37. But neither reason absolves Concise of any *legal* obligation to pay employees.

[7] In one of the depositions, Krasner testified that Nebraska Book had about $336,000 after liquidating, paying off Mountain Ridge, and collecting certain owed accounts. Filing 175-28 at 5. That money is in a bank account controlled by Concise. *Id.* Krasner testified that he and Concise have the authority to distribute the money in the account. When asked why the money wasn't used to pay employees' accrued vacation time, Krasner testified that "other expenses took priority," and "[h]ad we not faced this litigation, we might have had funds to pay some of the employees." Filing 175-28 at 7. Concise is funding this particular lawsuit with the remaining Nebraska Book funds.

control over the company as alleged and evidenced by the plaintiffs, the faltering company exception does not apply, and Concise may be liable for the WARN Act violation. However, if a factfinder determines that Concise was not the plaintiffs' "employer" under the Act, the affirmative defense bars any WARN Act recovery.

### 3. NWCPA LIABILITY

Both Concise and Mountain Ridge assert they cannot be liable under the NWCPA. For the reasons explained in the earlier memorandum and order, the Court is comfortable predicting that the NWPCA permits a worker to recover against a *de facto* employer. Filing 93 at 12. To the extent the parties ask the Court to reconsider that prediction, nothing in the briefing persuades the Court to do so.

However, based on the above, it's clear Mountain Ridge was not a *de facto* employer. Its motion for summary judgment will be granted. Whether Concise operated Nebraska Book to such a degree remains a fact-intensive question that cannot be answered on summary judgment. (That Concise now controls Nebraska Book's funds, and *could* pay out the vacation time owed under the NWCPA, particularly weighs in the plaintiffs' favor.) But, as discussed above, material issues of fact remain, precluding summary judgment. Both parties' motions are denied on this issue.

### 4. MOTIONS TO EXCLUDE

The plaintiffs have moved to exclude Mountain Ridge's expert (filing 152), who opined that Mountain Ridge's asset-based loan agreement, and the actions Mountain Ridge took during the course of its relationship with Nebraska Book, were "normal and customary" commercial actions. Filing 152

26

at 1. The Court did not rely on the expert's report, and the motion is denied as moot.

The plaintiffs also moved to exclude Concise's expert, Daniel Dooley, under the standard outlined in *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993). Filing 148. The objective of the *Daubert* inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. 2015). This is a flexible, case-specific inquiry: the Court must decide whether a particular expert had sufficient specialized knowledge to assist the factfinder in deciding the particular issues in the case. *Id.* at 723.

In exercising its gatekeeping function, the Court must make a preliminary assessment of whether the reasoning or methodology underlying the proposed expert testimony is valid and of whether that reasoning or methodology properly can be applied to the facts in issue, focusing specifically on the methodology and not the conclusions. *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000-01 (8th Cir. 2019). To that end, expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case, is inadmissible. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006); *In re Wholesale Grocery Prod.*, 946 F.3d at 1001.

"Cases are legion that under *Daubert*, liberal admission is prevalent and courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *In re Wholesale Grocery Prod.*, 946 F.3d at 1001 (cleaned up). As a general rule, deficiencies in an expert's factual basis go to weight and not admissibility. *In re Bair Hugger Forced Air Warming Devices*

*Prod. Liab. Litig.*, 9 F.4th 768, 786 (8th Cir. 2021); *Loudermill*, 863 F.2d at 570.

The plaintiffs argue Dooley's opinions would not be helpful to a factfinder, and that some of his opinions are inadmissible legal conclusions or factual narratives. The plaintiffs also argue Dooley's testimony fails to account for contrary evidence. Concise concedes that Dooley's opinion that Concise was not a "joint employer" is an inadmissible legal conclusion, so the motion will be granted in that respect. Filing 204 at 5 n.2.

But Dooley's opinions about whether Krasner's conduct was "appropriate"—that is, whether his behavior was "perfectly consistent with the norms of corporate behavior"—is a key issue in this case, if not dispositive. *See Bestfoods*, 524 U.S. at 70 n.13. It would be helpful to the finder of fact to hear what those norms are. *See PFS Distrib. Co. v. Raduechel*, 574 F.3d 580, 597 (8th Cir. 2009). While the plaintiffs complain that Dooley testifies to what is "appropriate" or "proper" without articulating precise definitions or standards, Dooley's opinions lie in his professional experience, which is a proper foundation. Filing 150-2 at 13; *e.g., Marmo*, 457 F.3d at 754. The deficiencies identified by the plaintiffs in Dooley's opinions can be tested on cross-examination.

The plaintiffs' next argument is that Dooley's testimony, after "[s]tripping away [his] 'appropriateness' opinions and legal conclusions leaves only his recitation of the facts and his inferences from them." Filing 149 at 10. Because the Court is not "stripping away" the "appropriateness" opinions, this argument appears to be moot. But nothing in this order precludes the plaintiffs from objecting to the extent Dooley's testimony at trial becomes a factual narrative, rather than an explanation of his expert opinion.

Finally, the plaintiffs assert exclusion is proper because Dooley failed to account for contrary evidence. But such a failure is not a basis to exclude. *See Crabar/GBF, Inc. v. Wright,* 142 F.4th 576, 588 (8th Cir. 2025). Rather, these arguments go to weight, not admissibility. *Id.* (citing *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.,* 9 F.4th at 777). An expert may, and often must, assume that the party for which he is testifying can prove the facts upon which he relies. The method for testing those assumptions lies in "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *See id.* (quoting *Daubert,* 509 U.S. at 596). The plaintiffs' motion on this basis is denied.

## IV. CONCLUSION

The only live issues in this case involve whether Concise can be said to have controlled Nebraska Book to such a degree that Concise became the "employer" of the plaintiffs for purposes of WARN Act and NWPCA liability. The resolution of those issues depends on the credibility of the evidence and witnesses, both fact and expert, and cannot be assessed on summary judgment.

As Concise put it, the WARN Act is intended to discourage calculated corporate cost-saving opportunism. Filing 168 at 34. If Concise exercised the level of control over Nebraska Book suggested by the plaintiffs' evidence, Concise should have funded the company another 60 days. The "faltering company exception" could not apply, because nothing in the record indicates that Concise was "faltering" as a result of Nebraska Book's financial problems. The key question of fact to be determined is whether Concise took on Nebraska Book's liabilities when it obtained 100 percent of the company and when it allegedly operated Nebraska Book as a going concern. That matter will be resolved at trial.

IT IS ORDERED:

1.  Mountain Ridge's motion to join in certain arguments (filing 179) is granted.

2.  Nebraska Book's motion for summary judgment (filing 156) is denied.

3.  Mountain Ridge's motion for summary judgment (filing 157) is granted.

4.  The plaintiffs' motion for summary judgment (filing 173) is denied in part.

5.  Concise's motion for summary judgment (filing 167) is denied.

6.  The plaintiffs' motion to exclude Daniel Dooley (filing 148) is denied in part.

7.  The plaintiffs' motion to exclude Peggy Cummins (filing 151) is denied as moot.

8.  Mountain Ridge's motion to strike the jury demand (filing 180) is denied as moot.

9.  The Clerk of the Court is directed to terminate Mountain Ridge as a party.

Dated this 23rd day of April, 2026.

BY THE COURT:

John M. Gerrard
Senior United States District Judge